**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARACELIS RUFFOLO, DOMINIQUE BONSEIGNEUR, and BIANCA FAIRMAN, on behalf of themselves and all other plaintiffs similarly situated, | ) ) ) ) | |
| | ) | Case No. 1:18-cv-03305 |
| Plaintiffs, | ) ) | |
| | ) | Honorable Harry D. Leinenweber |
| v. | ) | |
| | ) | |
| LASALLE GROUP, INC. and TAMYRA MIRACLE, individually, | ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT THE LASALLE GROUP, INC.'S MOTION FOR PARTIAL**
**RECONSIDERATION OF THE COURT'S FEBRUARY 28, 2019 ORDER**

Under Rule 59(e) of the Federal Rules of Civil Procedure, Defendant THE LASALLE GROUP, INC. ("LaSalle") moves for partial reconsideration of the Court's February 28, 2019 Memorandum Opinion and Order ("February 28 Order") that conditionally certified a nationwide collective of all hourly employees. (Exhibit 1, ECF No. 33.) In support, LaSalle states as follows:

## I.     INTRODUCTION

LaSalle respectfully submits that the Court erred as a matter of fact and law when, based on two declarations, it granted conditional certification of a nationwide collective of all hourly employees who were allegedly shorted wages based on LaSalle's lunch deduction policy. LaSalle asks the Court to reconsider the scope of its order and its decision not to review Plaintiffs' deposition testimony in considering whether Plaintiffs met their burden at the first stage of conditional certification under the FLSA.

When reviewing a conditional certification motion, this Court held less than two years ago that a court must "evaluate[] the record before it" to determine whether plaintiffs make "a minimal showing of other similarly situated employees subjected to a common policy." *Muir v. Guardian Heating and Cooling Servs.*, 2017 W 959028, at *2 (N.D. Ill. Mar. 13, 2017) (Leinenweber, J.) (citing *Rottman v. Old Second Bancorp, Inc.*, 735 F.Supp.2d 988, 990 (N.D. Ill. 2010)). Yet, the Court departed from this standard in its February 28 Order, and declined to evaluate the record before it, which included Plaintiffs' deposition testimony.

As a result, the Court's decision was respectfully mistaken because Plaintiffs' own record evidence of an allegedly common unlawful practice is far narrower than the Court considered. Plaintiffs' deposition testimony should be considered *not* to undermine Plaintiffs' credibility, weigh the merits, or make factual findings. Rather, under the particular facts of this case, their testimony should be considered because it explains, in Plaintiffs' own words, what Plaintiffs actually meant in the declarations they submitted in support of conditional certification. Their

1

Case: 1:18-cv-03305 Document #: 36 Filed: 03/21/19 Page 3 of 17 PageID #:502

testimony shows that Plaintiffs are *not asserting* that a common unlawful lunch-break policy affected all hourly employees at all locations nationwide.  Rather, they are asserting only that a common unlawful lunch-break policy affected them and caregivers at one location – South Barrington, Illinois – under one supervisor – Tamyra Miracle ("Miracle") – who allegedly required them to provide patient care during lunch.

This is tremendously important because the expense and time of unwarranted nationwide collective discovery would be crushing to an organization like LaSalle, whose mission is to provide critical, quality, and compassionate care to individuals with dementia and their families.  LaSalle operates about 40 small assisted living and memory care facilities.  Each community houses no more than 55 live-in Alzheimer's and dementia patients to provide individualized care and family services.  The same family that founded LaSalle in 1990 continues to operate it today.  While it is continuing to gather information about a putative nationwide collective,[1] it estimates that would include over 6,000 employees in nine states.

It also would not serve the Court's interests in judicial economy and efficiency to oversee nationwide discovery and motion practice to dismiss or strike out-of-state opt-in plaintiffs over whom the Court lacks jurisdiction.[2]  After several months and thousands of dollars in litigation costs, the Court will only find what is evident now:  Plaintiffs cannot meet their modest burden that they are similarly situated to others, based on their own statements.  *Williams v. Angie's List, Inc.*, 2017 WL 1546319, at *3 (S.D. Ind. Apr. 27, 2017) ("[I]t would be a waste of the Court's and

---

[1] The parties have agreed to an extension of time for LaSalle to provide this information to Plaintiff, to and including April 22, 2019, and to toll the statute of limitations from March 22, 2019 to April 22, 2019.

[2] If any out-of-state plaintiffs opt into this lawsuit, given that LaSalle is headquartered and incorporated in Texas, LaSalle will argue that *Bristol-Myers Squibb v. Superior Court of California*, 137 S. Ct. 1773 (2017) deprives the Court of specific personal jurisdiction over their claims and anticipates filing motions to dismiss and/or strike their claims. *See also Debernardis v. NBTY, Inc.*, 2018 WL 461228 (N.D. Ill. 2018) (Leinenweber, J.) (recognizing *Bristol-Myers* in context of Rule 23 class).  Under the FLSA, no out-of-state plaintiff is part of this case until they actually opt into the action.  29 U.S.C. §216(b).

2

the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a class action because the class members are not similarly situated."); *see also Tom v. Generac Power Systems, Inc.*, 2018 WL 3696607 at *3 (E.D. Wisc. Aug. 3, 2018) ("Because a plaintiff's discovery demands upon conditional certification may impose a 'tremendous financial burden to the employer' courts must be careful to avoid wasting the parties' time and resources in cases that do not warrant certification.") (internal quotations omitted).

For these reasons, LaSalle respectfully requests this Court reconsider and review Plaintiffs' deposition transcripts as part of the "record before it," and after doing so, vacate its nationwide conditional certification and instead limit conditional certification to a collective of administrative managers, life engagement specialists, and caregivers at South Barrington under Miracle's supervision.

## II.    ARGUMENT

Rule 59(e) permits a litigant to move to alter or amend a judgment within 28 days after the entry of the judgment. Fed. R. Civ. P. 59(e). To succeed on a motion for reconsideration, the moving party must show that the court committed an error of law or fact; not merely rehash previous arguments. *Hicks v. Midwest Transit, Inc.*, 531 F.3d 467, 474 (7th Cir. 2008). Further it must "give the tribunal to which it is addressed a reason for changing its mind." *Ahmed v. Ashcroft*, 388 F.3d 247, 249 (7th Cir. 2004).

Here, LaSalle submits that reconsideration is warranted because the Court did not consider Plaintiffs' deposition testimony, which showed, in their own words, that Plaintiffs' allegations of a common policy that violates the FLSA are limited to a single facility and a single executive director. Plaintiffs' evidence, therefore, does not support the Court's conditional certification of a nationwide collective, even under the lenient standard of stage one of conditional certification.

3

**A.       It is Appropriate to Consider Plaintiffs' Deposition Testimony that Explains Their Declarations in Support of Conditional Certification.**

As this Court previously held in *Muir,* at stage one of conditional certification, the court must "evaluate[] the record before it" to determine whether plaintiffs make "a minimal showing of other similarly situated employees subjected to a common policy."  2017 W 959028, at *2 (citing *Rottman*, 735 F. Supp. 2d at 990).  While this standard is a low bar for plaintiffs, it is not automatic.  "The court is under no obligation . . . to accept the plaintiff's allegations as true." *Rottman*, 735 F. Supp. 2d at 990.  Rather, the court evaluates the record before it, including evidence that plaintiffs are not similarly situated to other putative class members. *Id.*

The record before the Court at conditional certification in this case included Plaintiffs' depositions, in which they make sworn statements clarifying their allegations in this case, their own declarations, and the extent of their personal knowledge.  But in its February 28 Order, the Court did not "evaluate[] the record before it."  It disregarded Plaintiffs' deposition testimony and relied instead entirely on Plaintiffs' declarations (which were further clarified in their depositions). In doing so, the Court departed from the standard it recently applied in *Muir*.

In its conditional certification opinion, the Court cited to *Pfefferkorn v. PrimeSource Health Group, LLC*, 2019 WL 354968, at *2 (N.D. Ill. Jan. 29, 2019), to state that the "lenient 'modest factual standard' applies at the conditional certification" and declining to "delve into factual disputes stemming from Plaintiffs' depositions at this stage."  (Exhibit 1, p. 16.)  Even under *Pfefferkorn*'s standard for stage one review, where the court does not review the "record before it" and declines to review "opposing evidence," plaintiffs still must provide "some factual support" including "in the form of affidavits, declarations, *deposition testimony*, or other documents."  2019 WL 354968, at *2 (internal quotations omitted) (emphasis added).  Here, Plaintiffs' depositions are not even in the nature of true oppositional evidence—*e.g.*, counter-

4

declarations setting forth alternative versions of the facts. Rather, they clarify what Plaintiffs actually knew and what their declarations meant, in their own words.

The Court cited other cases in its February 28 Order that support the Court's reconsideration and review of Plaintiffs' deposition testimony. For example in *Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852 (N.D. Ill. 2013), the parties took limited discovery before briefing conditional certification, and the court considered all the evidence submitted by the parties while still acknowledging that plaintiffs' "modest showing need not be conclusive." *Id.* at 860; *see also Briggs v. PNC Fin. Servs. Grp.*, 2016 WL 1043429, at *2 (N.D. Ill. Mar. 3, 2016) ("Affidavits, declarations, other documents, or deposition testimony can support this 'modest factual showing.'") (citing *Calverly v. Careerbuilding, LLC*, No. 13 C 1967, 2015 WL 4450045, at *1 (N.D. Ill. July 20, 2015)).[3] Plaintiffs must do more than demonstrate any common policy. They must demonstrate a common policy that violates the FLSA across the entire putative collective. *See, e.g., Grosscup v. KPW Mgmt.*, 261 F. Supp. 3d 867, 870 (N.D. Ill. 2017); *Berry v. Quick Test, Inc.*, 2012 WL 1133803, at *5-7 (N.D. Ill. Apr. 4, 2012); *Shiner v. Select Comfort Corp.*, 2009 WL 4884166, at *4 (N.D. Ill. Dec. 9, 2009); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042 (2003).

---

[3] The Court's February 28 Order also stated that LaSalle's opposition to conditional certification was "insufficient and inappropriate" because LaSalle attached only pertinent excerpts of Plaintiffs' deposition transcripts that it had cited, and not the complete transcripts. (Exhibit 1, p. 12, citing *Nicks v. Koch Meat Co., Inc*., 265 F. Supp. 3d 841, 850 (N.D. Ill. 2017).) LaSalle is attaching full transcripts to this Motion, and certainly never intended to deprive the Court a full review of the evidence. LaSalle did not provide full transcripts solely to avoid bogging down the Court in unnecessary paper and information. LaSalle's depositions of the two Plaintiffs involved several factual issues unrelated to the motion for conditional certification (*i.e*., their terminations of employment and individual defamation claims). Respectfully, LaSalle is unaware of any local rule or standing order that requires attaching full transcripts. *Koch Meats* does not address deposition transcripts and Plaintiffs' conditional certification reply brief did not object to or challenge Plaintiffs' undisputed deposition testimony. *See Gomez v. Riccio*, 2005 WL 2978955, at *3 (N.D. Ill. Nov. 1, 2005) (neither local rules nor case law require attachment of full transcripts, and "plaintiff was free to attach to her response any other transcript excerpts counsel believed to be pertinent.").

Therefore, LaSalle asks the Court to evaluate the record before it, including Plaintiffs'

deposition testimony – not to assess Plaintiffs' credibility, weigh the merits, or make factual

findings – but simply because their testimony explains, in their own words, the statements in their

declarations upon which the Court relied extensively in granting nationwide conditional

certification. Under the case law in this district, even at stage one of conditional certification,

LaSalle asks the Court to review the "facts primarily based on the showing made by" Plaintiffs,

including their deposition testimony that provides their own explanations of what they meant in

their declarations. *Bergman*, 949 F. Supp. 2d at 860. As Plaintiffs' deposition testimony

demonstrates, their allegations of a common plan that violates the FLSA are limited to one location

and one manager.

**B.** **Plaintiffs' Deposition Testimony Limits Their Assertions of an Alleged Common Unlawful Policy to a Single Location under a Single Executive Director.**

Plaintiffs' deposition testimony shows that their personal knowledge of an alleged common

unlawful practice is limited to LaSalle's South Barrington location from May 2017 (when Miracle

became executive director) to November 2017 (when Plaintiffs' employment ended). *Howard v.*

*Securitas Security Servs.*, 2009 WL 140126, at \*3 (N.D. Ill. Jan. 20, 2009) ("[T]he statements in

the plaintiffs' declarations must, at a minimum, be based on personal knowledge."). This

testimony clarifies and explains the specific paragraphs of Plaintiffs' declarations on which the

Court relied. (Exhibit 1, pp. 6-7, citing paras. 11-12 of Ruffolo's declaration and paras. 7-8, 11-13

of Bonseigneur's declaration.)

Paragraphs 11 of Bonseigneur's and Ruffolo's respective declarations both state:

> 11.    I observed other hourly employees who were unable to take
> lunch breaks. I also observed other hourly employees who did not
> take a 30-minute break to eat lunch.

(ECF No. 14-2, 14-3.)

Paragraph 12 of Ruffolo's declaration states:

> 12.     I talked to other employees at both locations where I worked about whether or not they were paid for all hours they worked. Many employees reported to me that they too had their pay deducted but were not permitted to take a lunch break or were not allowed to take the full 30 minutes.

(ECF No. 14-3.)

And Paragraphs 7, 8, 12, and 13 of Bonseigneur's declaration state:

7.     LaSalle's policy of not having employees punch in and out other than at the beginning or end of the workday was communicated to me as part of my training as an Administrator. Approximately every month for the entire time I held the title of Administrator, I was required by LaSalle to attend webinars on how to properly use LaSalle's timekeeping system, PayCom. These webinars were attended by Administrators from LaSalle's facilities in Illinois, Texas, and Florida.

8.     LaSalle communicated to the Administrators that all hourly employees were to be told not to punch in and out on the time clock if they took a lunch break. One of my duties as an Administrator was to "on board" new employees. Part of that process included informing the new employees of LaSalle's policies and procedures.
. . .

12.     Many employees complained to me about the automatic deduction. I told them that the deductions were LaSalle's policy and directed them to managers to lodge their complaints. When I complained myself to management about not being able to take a lunch break, I was told that I would not get paid and that I needed to manage my time better.

13.     In approximately June or July 2017, I told Defendant Miracle, the Executive Director of the South Barrington location that many hourly employees were having time deducted for lunches they were not taking. Defendant Miracle told me to communicate to the employees that if they ate any food, that was their break, even if they were working feeding the residents or performing other duties while they were grabbing something to eat.

(ECF No. 14-2.) Based on only these statements, the Court found that Plaintiffs "allege personal knowledge of other employees who were forced to work through unpaid lunch breaks" and that "Bonseigneur, as a former LaSalle administrator, was also able to allege specific facts about the company-wide nature of the allegedly unlawful policy." (Exhibit 1, p. 6.)

Plaintiffs' deposition testimony significantly narrows their sweeping declaration assertions. By evaluating the record before it including deposition testimony, the Court will see

7

its determination was not supported by Plaintiffs' own words.[4] Plaintiffs' personal knowledge of

a common unlawful practice occurred only at the South Barrington location when Miracle was the

executive director. Not only did Plaintiffs assert that the unlawful lunch-break practice was limited

to South Barrington under Miracle, but as described below, Plaintiffs confirmed either that the

lunch-break practices were lawful at other facilities in which they worked or that they do not know

about the lunch-break practices for other employees at other LaSalle facilities.

> **1.  Ruffolo's personal knowledge of other employees who worked through lunch without being paid is limited to Bonseigneur, herself, and caregivers at South Barrington when Miracle was Executive Director.**

Important to the Court's analysis of the "record before it," Ruffolo explained her statements

in her declaration as follows:

> **Q.**     Okay. In paragraph 12 [of your declaration] you state: I talked to other hourly employees at both locations where I worked. If you'll finish reading that and then I'll have a couple questions for you about that paragraph.
> **A.**     Where I worked about whether or not they were paid for all hours worked. Many employees reported to me that they, too, had their pay deducted but were not permitted to take a break or were not allowed to take the full 30 minutes.
> **Q.**     Is that a true statement?
> **A.**     Yes.
> **Q.**     What does that reference?
> **A.**     That references Tamyra telling -- saying to all employees to help feed the residents during their lunch hour.
> **Q.**     Who did Tamyra say that to specifically?
> **A.**     Caregivers and myself.
> **Q.**     Anyone else?
> **A.**     Dominique. Bianca was a caregiver, so she falls under the caregiver category. And that's it. I mean, I can't tell you who else she said it to. I can tell you who I saw her say it to, and these were --
> **Q.**     Yes. That's what I'm asking about.
> **A.**     Okay. And these were them.
> **Q.**     That's what you're referring to in line 12?
> **A.**     Yes.

---

[4] Plaintiff Bonseigneur's declaration at paragraphs 7-8 did not allege any specific facts about a company-wide unlawful policy. At best, she has knowledge of lunch-break practices in only three states.

. . .
**Q.** Okay. Is there anything else that you're referring to in line
12 when you talk about other hourly employees at both locations not
being permitted to take a lunch break?
**A.** Just that.

(Exhibit 2, Ruffolo Dep., pp. 85:12-88:20.) Ruffolo also confirmed throughout her deposition that

her personal knowledge of other employees being forced to work through unpaid lunch breaks was

limited to Bonseigneur, the caregivers, and herself at the South Barrington location when Miracle

was in charge.

**Q.** And why do you believe that you were not paid for that 30
minutes [lunch break]?
**A.** The lunch breaks were automatically deducted from our pay,
and we would routinely let the ED know, Tamyra, that we -- at her
behest we would have to feed the residents during our lunch break
and we would routinely say, you know, this is still coming out of
our paycheck, and her routine -- her standard response was you need
to learn to manage your time better.

(*Id.* pp. 35:23-36:14.)

**Q.** Okay. And are you aware of whether employees in other
jobs other than yours even missed their meal breaks?
**A.** Am I aware if other employees missed their meal breaks?
**Q.** Yes.
**A.** Yes, the caregivers and I would be feeding the residents
during our lunch hours.
. . .
**Q.** And so other than the caregivers --
**A.** Uh-huh.
**Q.** -- are you aware of any other employees who did not miss
their lunch breaks and routinely took their lunch break?
**A.** I don't know. I can't answer that.
**Q.** You don't know one way or another?
**A.** I don't. I don't.
**Q.** Okay. Do you have personal knowledge about how the
lunch breaks were handled in locations other than St. Charles or
South Barrington?
**A.** I do not.

(*Id.* pp. 93:6-95:9.) Accordingly, pursuant to Ruffolo's own testimony, her assertion of a common

unlawful lunch-break practice was limited to Miracle's direction at South Barrington.

9

She also testified that, while she worked at St. Charles part-time every other weekend, she

was not subject to the automatic lunch deduction at all, but instead "at Autumn Leaves St. Charles

they taught us to clock in and out at lunch." (*Id.* p. 38:3-10.)  She has no personal knowledge of

the lunch-break practice for other employees during the week.  (*Id.* p. 26:4-20.)

> **Q.**      And do you have any knowledge of how the lunch breaks
> were happening Monday through Friday at St. Charles when you
> weren't working there?
> **A.**      I do not know, no.

(*Id.* p. 95:10-13.)  Ruffolo's evidence of a common unlawful lunch-break practice involving only

certain job functions under one supervisor in one location does not support conditional certification

of a nationwide collective of all hourly employees.

> **2.**      **Similarly, Bonseigneur's allegations that she and others were not paid
> properly when they worked through lunch are limited to the South
> Barrington facility when Miracle was the executive director.**

Bonseigneur testified specifically that her personal knowledge of a common unlawful

lunch-break practice is limited to South Barrington under Miracle's direction.  When Bonseigneur

worked at the St. Charles location, she and others completed missed lunch forms when they worked

through lunch, and the auto-deduction in Paycom would be overridden:

> **Q.**      Okay.  [As a caregiver at St. Charles] What was the process
> if you missed your lunch?
> **A.**      You would fill out a time sheet and check off the -- there was
> a box for if you didn't take a lunch, you would sign it, and turn it in
> to the admin.
> . . .
> **Q.**      Okay.  And nobody in St. Charles ever told you not to take
> a lunch, right?
> **A.**      No.
> **Q.**      And then what about when you were a lead caregiver in St.
> Charles, did your lunch process change at all?
> **A.**      No.
> **Q.**      Okay.  It was that same situation where you would fill out a
> missed lunch form when you remembered?
> **A.**      Yes.

**Q.** Okay. And then you would get – that would undo the auto deduct, right?

**A.** Yes.

(Exhibit 3, Bonseigneur Dep., pp. 105:17-106:1, 106:17-107:6.)

**Q.** Okay. And what was the process for missed lunches in South Barrington? Was it any different?

**A.** No.

**Q.** Okay. An employee would fill out a missed lunch form?

**A.** Yes.

**Q.** Okay. And then they would get paid for the lunch?

**A.** Yes.

**Q.** Did you ever have -- I know you already mentioned some conversations you had with Ms. Miracle about the lunch process, but, you know, when you first got to South Barrington, for example, did you have conversations with Amelia or one of the other EDs as they took over there about how the lunch process worked?

**A.** No.

**Q.** Okay.

**A.** There was -- there were no issues. If someone missed a lunch, we put it in the computer as an override.

(*Id.* pp. 109:10-110:23.)

**Q.** Okay. So paragraph 4 says LaSalle has a policy of automatically deducting 30-minute lunches from all of its hourly employees' time, regardless of whether or not the employee actually took a lunch break, right?

**A.** Yes.

**Q.** Okay. Now at St. Charles, for example, every time that you filled out a missed lunch form were you paid for your lunch?

**A.** Myself?

**Q.** Yes.

**A.** Yes.

**Q.** Okay. So this paragraph 4, is that just related to the South Barrington facility?

**A.** For me, yes.

**Q.** Okay. You don't have any issues at the St. Charles facility?

**A.** No.

**Q.** Do you have any issues in terms of your compensation, be it lunch break or otherwise, at the South Barrington facility before Tamyra was the executive director?

**A.** No.

**Q.** Okay. So is it fair to say that your claims in this case are limited to the South Barrington facility during the point in time that Tamyra Miracle became the executive director?

**A.** Yes.

11

> **Q.**     Okay.  So these practices are something that vary based on the executive director who is in charge, is that fair to say, in your experience?
> **A.**     Yes.

(*Id.* pp. 157:11-158:18.)

Bonseigneur's personal knowledge of facilities other than St. Charles (where there was never an unlawful lunch-break practice) and South Barrington (where she asserts there was no unlawful lunch-break practice until Miracle became executive director) is limited to three other locations – Arlington Heights, Vernon Hills, and a Wisconsin location – and the locations that participated in the webinar trainings – Illinois, Texas, and Florida.  But Bonseigneur does not know how executive directors at those facilities handled lunch breaks or whether their practices were actually unlawful.

> **Q.**     Okay.  But do you know how they did the lunch waiver process in any location outside of St. Charles or -- yes, St. Charles or South Barrington?
> **A.**     St. Charles you --
> **Q.**     We -- right.  We talked about St. Charles.
> **A.**     Yeah, St. Charles.
> **Q.**     We talked about South Barrington.  Do you have personal knowledge about how that process would work in any other facility?
> **A.**     Arlington Heights I do.  Arlington Heights you would fill the paper out and -- if you did not take a lunch and they would override it.
> **Q.**     Okay.
> **A.**     I'm not familiar with the other ones.
> **Q.**     Okay.  You don't know how they did the lunch process?
> **A.**     Correct.

(*Id.* pp. 160:6-164:10.)  In summary, Bonseigneur affirmatively testified that at the St. Charles and Arlington Heights facilities, the lunch-break practice was lawful – as employees fill out a form and get paid for the 30 minutes when they work through lunch.  She testified she had no meal-break claims at South Barrington under other supervisors or at St. Charles when she worked there.  At the other locations, Bonseigneur has no personal knowledge of how management handled

12

situations where employees worked through lunch and needed to waive the automatic 30-minute deduction in Paycom, but admitted that in her personal experience the handling of the lunch issue varied by executive director.

### C. Plaintiffs' Limited Allegations and Personal Knowledge Do Not Warrant Conditional Certification of a Nationwide Collective of All Hourly Employees.

Courts applying the lenient standard at the first stage of conditional certification have properly narrowed scope of the conditionally certified collective to the locations or job positions about which plaintiffs have personal knowledge of an alleged common unlawful practice and have demonstrated that some unifying experience, such as the demands of patient care, has led to the alleged FLSA violation. Indeed, this Court made such a limitation in *Muir*, limiting the scope of conditional certification to service representatives and installers based on their job duties. 2017 WL 959028 at *9; *see also Bergman,* 949 F. Supp. 2d at 854, 860 (limiting conditional certification regarding automatic lunch deduction practice to nurses and hospital employees engaged in direct care of patients, because plaintiffs' evidence demonstrated that meal breaks were interrupted by the demands of patient care but did not go beyond that);[5] *DeMarco v. Northwestern Mem.*, 2011 WL 3510905, at *4 (N.D. Ill. Aug. 10, 2011) (limiting conditional certification on auto-deduct issue to nurses and direct patient care providers who had interrupted meals due to patient care).[6] Several other courts in this jurisdiction similarly have declined to conditionally certify a

---

[5] The record in *Bergman* did involve 11 months of discovery, which the court determined was required based on "the represented magnitude of the case and the expenses it will and could impose." *Id.* at 854. Given the size of the potential collective, the court considered evidentiary submissions from both sides.

[6] Notably, the court in *DeMarco* did consider the plaintiff's deposition testimony. *See id.* at *3. In limiting the scope of its conditional certification order, the court opined that plaintiff's "evidentiary submissions are limited to nurses and other direct patient care providers whose duties, by their very nature, often resulted in interrupted meal breaks. [Plaintiff] presents no evidence, and does not even raise a permissible inference, that similar conditions were faced by employees not focused directly on patient care. The court may narrow the lead plaintiff's proposed opt-in class where first stage evidence provides no tangible support for including certain employees in the class." This logic is true in this case, as Plaintiffs provided "no tangible support" for their allegations outside of one facility and one supervisor.

nationwide collective where such broad certification is unsupported by plaintiffs' evidence.[7]  In contrast, courts that have conditionally certified a nationwide collective have done so only when the putative class is limited to a specific job position or when plaintiffs' evidence supported a common unlawful practice across several locations.  Specific examples include several of the cases on which the Court relied in its February 28 Order.[8]

In this case, Plaintiffs' deposition testimony explaining the statements in their declarations shows that they do not have enough to make even the "minimal showing" that all hourly employees nationwide are "victims of a common policy that violated the law."  *Muir*, 2017 W 959028, at *2.  Their evidence of a common *unlawful* lunch-break practice is limited to the South Barrington location while Miracle was the executive director when she allegedly required Ruffolo, Bonseigneur, and caregivers to provide patient care during their lunch breaks.  Upon evaluating the record before it, this Court should vacate its conditional certification of a nationwide class, and limit the conditionally certified collective to administrative managers, life engagement specialists, and caregivers working in the South Barrington location under Miracle's supervision.

---

[7] *See Slaughter v. Caidan Mngmt. Co., LLC*, 317 F.Supp.3d 981 (N.D. Ill. July 5, 2018) (declining to include certain positions in scope of conditional certification based on scant evidence submitted by plaintiffs relative to those positions); *Argano v. Landry's Inc.*, 2013 WL 12323615, at *4 (N.D. Ill. May 7, 2013) (plaintiffs did not demonstrate a sufficient factual showing for a nationwide class where two affiants only worked at the Chicago chain restaurant location); *Brand v. Comcast Corp.*, 2012 WL 4482124, at *5-6 (N.D. Ill. Sept. 26, 2012) (limiting notice of conditional certification to technicians at the location where plaintiff worked where plaintiff failed to show knowledge of policies and practices at other locations); *Berry v. Quick Test, Inc.*, 2012 WL 1133803, at *5–7 (N.D. Ill. Apr. 4, 2012) (declining to certify nationwide class where plaintiffs failed to show that employees at other offices were victims of common policy or plan).

[8] *See Koch Meats*, 265 F. Supp. 3d at 854 (nationwide collective of chicken-catchers with same job functions based on five declarations from chicken-catchers in two different states); *Fields v. Bancsource*, No. 14-cv-7202, 2015 WL 3654395, at *4 (N.D. Ill. June 10, 2015) (nationwide collective of field technicians subject to similar job conditions and policies); *Rottman*, 735 F. Supp. 2d at 991 (nationwide collective loan officers who had the same job functions); *Briggs*, 2016 WL 1043429, at *4 (nationwide collective of Assistant Branch Managers with same duties and expectations based on declarations from five former ABMs from five states); *Kelly v. Bluegreen Corp.*, 256 F.R.D. 626, 627 (W.D. Wis. 2009) (nationwide collective limited to commission-only sales representatives based on declarants from two different states).

14

### III. CONCLUSION

For these reasons, Defendant The LaSalle Group, Inc. requests the Court enter an order granting this Motion for Partial Reconsideration, vacating its February 28 Order to the extent it conditionally certified a nationwide collective of hourly employees, ordering conditional certification of a collective including administrative managers, life engagement specialists, and caregivers working in the South Barrington, Illinois location from May 2017 (when Miracle became the executive director), staying issuance of the notice to the putative collective members pending resolution of this Motion, and granting such further relief as the Court deems just and appropriate.

DATED:    March 21, 2019.                                        Respectfully submitted,


                                                        By:    /s/ Colleen G. DeRosa
                                                               One of the Attorneys for Defendant
Colleen G. DeRosa (ARDC No. 6301589)                           **THE LASALLE GROUP, INC.**
**OGLETREE, DEAKINS, NASH,**
  **SMOAK & STEWART, P.C.**
155 North Wacker Drive, Suite 4300
Chicago, IL 60606
Telephone:  312.558.1220
*colleen.derosa@ogletree.com*

Michael D. Ray (ARDC No. 6285109)
**OGLETREE, DEAKINS, NASH,**
  **SMOAK & STEWART, P.C.**
201 South College Street, Suite 2300
Charlotte, NC 28244
Telephone:  704.342.2588
*michael.ray@ogletree.com*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on March 21, 2019 the foregoing *Defendant The LaSalle Group, Inc.'s Motion for Partial Reconsideration of the Court's February 28, 2019 Order* was filed electronically with the Clerk of Court using the ECF system, which sent notification of such filing to the following:

> David J. Fish, Esq.
> Kimberly Hilton, Esq.
> John Kunze, Esq.
> **THE FISH LAW FIRM**
> 200 East 5th Avenue
> Suite 123
> Naperville, IL 60563
> *dfish@fishlawfirm.com*
> *khilton@fishlawfirm.com*
> *kunze@fishlawfirm.com*
>
> ***Attorneys for Plaintiff***

/s/  Colleen G. DeRosa

36281883.1

16